RAILROAD COMMISSION OF TEXAS V. HOUSTON CHAMBER OF COMMERCE ET AL.

No. 5575. Decided January 23, 1935.
(78 S. W., 2d Series, 591.)

*Claud Pollard,* former Attorney General, *R. L. Bobbitt,* Attorney General, *Jack Blalock,* Assistant Attorney General, *Hart H. Royston,* of Houston, and *Albert L. Reed,* of Dallas, for plaintiff in error.

The order of the Railroad Commission attacked in this case was a proper exercise of its power to make group rates. The effect of the decision of the Court of Civil Appeals is practically to deprive the Commission of that power. In an appeal from such ruling the burden of proof rests upon the plaintiff to show the unreasonableness of the rates, and there is no burden upon the Railroad Commission of Texas, or any person relying upon its order, to prove the reasonableness or the justice of a situation where one shipper may appear to be paying a less rate than another shipper. Virginia Coal Operation Assn. v. Aberdeen & R. R. R. Co., 120 I. C. C., 283, 292; Railroad Com-

mission of Texas v. Galveston Chamber of Commerce, 105 Texas, 101, 145 S. W., 573; Railroad Commission v. Weld & Neville, 96 Texas, 394, 73 S. W., 529.

*Fulbright, Crooker & Freeman, Baker, Botts, Parker & Garwood,* all of Houston, *Chas. C. Huff,* of Dallas, *A. H. Mc-Knight* and *Fred L. Wallace,* of Fort Worth, *Terry, Calvin & Mills,* of Galveston, for defendant in error.

The question as to whether rates established by orders of the Railroad Commission are unjustly discriminatory is a judicial question for the courts to decide. Galveston Chamber of Commerce v. Railroad Commission, 137 S. W., 737; Railroad Commission v. San Antonio Compress Company, 264 S. W., 214; Id., 114 Texas, 582, 278 S. W., 1115.

Mr. Judge RYAN delivered the opinion of the Commission of Appeals, Section B.

This case involves an attack upon the validity of a certain circular of the Railroad Commission of Texas, known as Circular No. 7529, issued March 20, 1928, which Circular ordered in force group rates on sugar and molasses shipments (intrastate, carloads 60,000 lbs. minimum) originating at Galveston, Texas City, Sugarland, Beaumont, Port Arthur and Houston.

The order of the Railroad Commission was attacked in the trial court in three separate suits, one instituted by the City of Houston, Houston Chamber of Commerce and other Houston interests; one instituted by the Missouri-Kansas-Texas Railroad Company of Texas and the Trinity and Brazos Valley Railroad Company, and one instituted by the Beaumont, Sour Lake and Western Ry. Co. and associated railroads. Upon proper motion the suits were consolidated and tried by the court without a jury, resulting in a judgment in favor of the defendant, upholding the order of the Railroad Commission in all particulars and denying the relief sought by any and all the plaintiffs. Separate appeals were filed by the plaintiffs in the trial court; the Court of Civil Appeals reversed the judgment of the trial court, and canceled and annulled the circular issued by the Railroad Commission of Texas, and perpetually enjoined its enforcement. 19 S. W. (2d) 583.

Prior to April 12, 1927, sugar, like most commodities and classes of freight, had been carried by Texas railroads upon what are known as "mileage scales" of rates, generally so arranged that a certain small rate per hundred pounds of freight carried a charge for the first five miles and a correspond-

ing increase for each additional five miles, reaching a maximum at various distances, the freight being transported for the maximum rate for all distances beyond the end of the mileage scales.

This mileage scale of rates on sugar was so arranged that 9 cents per hundred pounds (over a single line of railroad) and 13½ cents per hundred pounds (jointly over two or more lines of railroad) was charged for distances of 12 miles and less; the scale gradually increased in distances and correspondingly increased in the amount of cents per 100 pounds until it reached its maximum at 185 miles for which the rate was 50 cents per 100 pounds of sugar, in carloads with a minimum carload weight of 36,000 pounds.

On April 11, 1927, the Texas Railroad Commission issued its circular and entered its order (No. 7193) establishing new rates on sugar moving in carloads in intrastate traffic, which continued in effect the prior scale of rates then applicable to carload shipments of sugar with a minimum weight of 36,000 pounds, but established a new mileage scale applicable to carloads of sugar with a minimum weight of 60,000 pounds, to which applied a mileage scale varying from 10 cents per 100 pounds (with a single line of railroad) and 12 cents per 100 pounds (jointly via two or more lines of railroad) for the first ten miles and increased gradually for each additional 5 miles until the mileage scale reached its maximum of 73 cents per 100 pounds for distances of 975 miles and over.

Under this scale each locality within the State of Texas, as to such sugar shipments, enjoyed rates based upon the distance from such locality to the desired destination; there were no exceptions to this general rule.

Counsel for the Railroad Commission say that the adjustment of such rates was related to the adjustment of rates which obtained concurrently from New Orleans and other Louisiana producing points to Southwestern destinations, including points within the State of Texas, and was the result of action by the Interstate Commerce Commission involving rates from Louisiana producing points and Texas producing points, as well as other producing points, to points in Oklahoma (Docket 14781, Oklahoma Traffic Association v. Alabama Great Southern Ry. Co., 113 I. C. C., 635); such scale of rates materially reduced the then existing rates from Louisiana producing points to both Texas and Oklahoma destinations as well as the rates from Texas producing points to Oklahoma.

Sec. 4 of the Interstate Commerce Act makes it unlawful for

any common carrier subject to its provisions to charge or receive any greater compensation in the aggregate for a shorter than for a longer distance over the same line or route in the same direction, the shorter being included within the longer distance, or to charge any greater compensation as a through rate than the aggregate of the intermediate rates, or to charge as great a compensation for a shorter as for a longer distance, but the act provides relief upon application to the Interstate Commerce Commission, which may, in special cases, authorize a charge of less for longer than shorter distances, provided it is reasonably compensatory for the service performed.

In Docket 14781, rates were established from Louisiana producing points to Oklahoma via routes through Texas and the Interstate Commerce Commission denied such (so-called) *fourth section relief* on such movements; the effect of such denial was to require the carriers to publish rates from Louisiana producing points to Texas not higher than those concurrently applied from Louisiana points to Oklahoma.

The publication of the rates under Docket 14781 by reason of the denial of *fourth section relief* brought about a material reduction in the then existing rates from Louisiana producing points to Texas destinations.

The carriers did not publish concurrently with said tariff the same scale of rates for application from Texas producing points to Texas intrastate destinations.

Counsel for the Railroad Commission say "thereupon, the Commission *in order to meet the emergency created by the reduction of the rates on sugar from Louisiana to Texas,* after conference with the interested shippers and carriers, on April 11, 1927, issued Circular No. 7193, effective April 12, 1927; otherwise a situation would have arisen in which the Louisiana producers would have had a lower adjustment of rates from Louisiana to Texas than that applying concurrently from Texas producing points to Texas destinations—the sole and only purpose of Circular 7193 was to avoid the destructive effects of such a situation; it was an emergency measure entirely, which could not wait on the decision of Docket 2551 upon the facts as developed at the hearing of that cause which began on March 8, 1927."

In issuing that circular and order the Commission specifically provided that Cause No. 2551 "be and the same is hereby held open on the docket for such further and/or final orders as may be determined upon."

Circular 7529 issued on March 20, 1928, under attack in this

proceeding, was the final order in Docket 2551, which is the case in which the railroad Commission conducted the hearing.

Counsel for the Railroad Commission say that said order (Circular 7529) was made and entered under the following circumstances: "On or before March 8, 1927, the Dallas Chamber of Commerce on behalf of certain shippers, instituted a proceeding before the Commission praying a readjustment of the then existing Texas intrastate rates on sugar and molasses predicated upon a similar readjustment then published and to become effective on sugar, carloads, from New Orleans to Texas destinations. The Chamber of Commerce and Board of Trade of Galveston on behalf of itself and its members, and on behalf of Texas City and its shippers, filed a petition in intervention, the prayer being that should any change be made in the present carload rates on sugar from points in Texas, that Galveston and Texas City be grouped with Houston at the same rates as may be applied from and to Houston and to and from points beyond one hundred miles from Houston."

Interests at Beaumont, Port Arthur and Sugarland likewise intervened and requested equalization with Houston.

Said Circular 7529 amended commondity Tariff 33-A (Revised) theretofore issued by the Commission to govern in connection with the transportation of sugar and molasses, carloads, transported by railroads between points in Texas, by adding there, Item 2 as follows:

"*Item 2.* Houston rates to be observed as maxima:

"(a) Galveston, Texas City and Sugarland. Mileage rates applicable on sugar, carloads, from Houston to points in Texas distant more than 100 miles from Houston, shall be observed as maxima on shipments of sugar, carloads, from Galveston, Texas City or Sugarland to the same points (See Note).

"(b) Beaumont. Mileage rates applicable on sugar, carloads, from Houston to points in Texas distant more than 130 miles from Houston, shall be observed as maxima on shipments of sugar, carloads, from Beaumont to the same points (See Note).

"(c) Mileage rates applicable on sugar, carloads, from Houston to points in Texas distant more than 150 miles from Houston, shall be observed as maxima on shipments of sugar, carloads, from Port Arthur to the same points (See Note).

"*Note.* Rates to points intermediate via the rate making route from Houston not to be higher; otherwise exception to General Rule 8:"

General Rule 8 is as follows:

"8. When special rates are made over any railroad or railroads, from one point to another in this state, upon any commodity, the rate between those points, or between those points and points intermediate, or between intermediate points, shall not be higher, unless specified in the order establishing the rates." (Circular No. 3809, issued June 9, 1911.)

The Commission in its opinion handed down at the time of the issuance of Circular 7529 said "We must consider it (the situation) not only with respect to the cities themselves, with their respective industries, but we must also handle the situation with respect to the welfare of and the effect upon the general public. * * * The interest of the general public, not only in Texas but many of the other states, in the development of these ports is greater than the interest of the individual port cities themselves. * * * It is our view that our answer to this question of equalization should reflect what in our careful judgment would be for the best interest of the state and the country as a whole, having in mind at the same time the necessity of allowing a fair return to the carriers and the maintenance of a fair relative adjustment as between the different ports." The Commission then disavows any purpose to prefer one port over another, or by any rate adjustment, to place one port at a disadvantage over another and states there is nothing to prevent one port from competing with another on equal rates, it being to the advantage of the general public, the producer and the consumer to place the ports on as nearly an equal basis, all things considered, as possible.

It was testified at the trial, that Houston is situated approximately 50 miles northwest of Galveston, Beaumont approximately 82 miles easterly from Houston, Port Arthur approximately 19 miles south of Beaumont and east of Houston, Sugarland approximately 26 miles southwest of Houston, and Texas City about 8 miles northerly from Galveston directly across the bay from Galveston.

The effect of such order (Circular 7529) left in force the mileage scales provided for in Circular 7193 applying generally throughout the state, but singled out Houston by name and provided that five other named places in Texas should have as a maximum rate on sugar, the Houston rate wherever the Houston rate to destination (distant more than 100, 130 and 150 miles respectively) was lower than the mileage scale provided for by Circular 7193 from those places to the same destinations. These five places were thus singled out and designated by the order of the Railroad Commission as the only

places throughout the entire state to enjoy lower rates on sugar than those contained in the mileage scales provided in Circular 7193.

In addition, the railroads were ordered to charge no higher rates from such five places to points nearer Houston within such respective distances than the Houston rates for those destinations, when the nearer points are "intermediate via the rate-making route from Houston."

The Court of Civil Appeals overturned the judgment of the trial court sustaining the Railroad Commission, on the ground that the situation resulted in an unjust discrimination against Houston in favor of the other shipping points, in that the effect of the circular was to equalize Houston with them where Houston enjoyed the benefit of the lower rate, but Houston did not obtain a corresponding benefit in territory in which the rates were lower from the other shipping points; in other words, while the other several shipping points were equalized with Houston in Houston territory, there was no equalization between Houston and those points in the respective territories of the latter.

In its application for writ of error, the Railroad Commission complains,

*1st.* That the Court of Civil Appeals erred in substituting its judgment for that of the Commission as to what should constitute a group or group adjustment of freight rates, that being wholly legislative, and because involving the exercise of administrative powers of the Commission is a function which should not be administered in the courts.

*2nd.* That the Court of Civil Appeals erred in holding that Circular 7529 was an unreasonable and unjust discrimination against Houston and the complainants had not met the burden of proof required by statute when an order of the Railroad Commission is attacked.

*3d.* That the Court of Civil Appeals erred in holding that the lower rates which obtain from Galveston, Texas City, Beaumont, Port Arthur and Sugurland to destinations in Texas, than obtain from Houston to the same destinations, resulted from Circular 7529—the contention being that such lower rates resulted from Circular 7193 and Houston's remedy would be an attack upon such lower rates through hearings directed in protest against Circular 7193.

*4th.* That the Court of Civil Appeals erred in not holding that Houston's remedy was to apply first to the Commission for a modification of its order, as a condition precedent to its

right to contest judicially, the validity of the rates fixed by such order.

## OPINION.

■ *First:* While orders of the Commission are presumptively correct, an appeal to the courts is allowed therefrom, and the correctness of such orders there determined.

Art. 6453, Rev. Stat., 1925, provides "If any railroad company or other party at interest be dissatisfied with the decision of any rate, classification, rule, charge, order, act or regulation adopted by the Commission, such dissatisfied company or party may file a petition setting forth the particular cause or causes of objection to such decision, act, rate, rule, charge, classification or order, or to either or all of them, in a court of competent jurisdiction in Travis County, Texas, against said Commission as defendant. Said action shall have precedence over all other causes on the docket of a different nature, and shall be tried and determined as other civil causes in said court."

■ The statute does not make a motion for rehearing before the Commission, a condition precedent to an appeal to the courts and therefore none is necessary (51 C. J., p. 71); the making of rates is a legislative function but the determination as to whether a rate is unreasonable or for any reason is illegal is a judicial function. R. R. Commission v. Houston & T. C. Ry. Co., 90 Texas, 340; R. R. Commission v. Weld & Neville, 96 Texas, 403; 51 C. J., p. 12.

This disposes of the first and fourth complaints above.

■ *Second:* On the question of burden of proof required by statute when an order of the Railroad Commission is attacked directly, the statute (Art. 6454, Rev. Stat., 1925) now reads: "The burden of proof shall rest upon the plaintiff to show the rates, regulations, orders, classifications, acts or charges complained of are unreasonable and unjust to it or them."

The codifiers of the 1925 revision left unchanged Art. 6658 of the Rev. Stat., 1911 (which in turn was Art. 4566 of the Rev. Stat., 1895) on the subject, except the omission after the word "show" of the words "by clear and satisfactory evidence"; under the statute now in force the controversy must therefore be determined, so far as the "burden of proof" is concerned, by the same rules governing in ordinary civil cases.

The Commission is given authority (Articles 6445, 6448, Rev. Stat., 1925) to adopt all necessary rates, charges and

regulations, to govern and regulate freight and passenger traffic, to correct abuses and prevent unjust discrimination and extortion in rates of freight and passenger traffic on the different railroads in this state.

"Unjust discrimination" is constituted (Art. 6474, Rev. Stat., 1925), *1st:* if any railroad subject to the statute, directly or indirectly, or by any special rate, rebate, drawback or other device, shall charge, demand, collect or receive or receives from any person, firm or corporation, a greater or less compensation for any service rendered by it than from any other person, firm or corporation for doing a like and contemporaneous service, or give any undue or unreasonable preference or advantage to any particular person, firm or corporation, *or locality,* or to subject any particular description of traffic to any undue or unreasonable prejudice, delay or disadvantage in any respect whatsoever; *2d:* if any railroad company shall charge or receive any greater compensation in the aggregate for the transportation of like kind of property or passengers for the shorter line than for a longer distance over the same line. But, it is provided that upon application to the Commission any railroad may in special cases, to prevent manifest injury, be authorized to charge less for longer than for shorter distances for transporting persons and property, and the Commission shall from time to time prescribe the extent to which such designated railroad may be relieved from the operation of the statute. It is also provided that no injustice shall be imposed upon any citizen at intermediate points, and that "nothing herein shall be so construed as to prevent the Commission from making what are known as 'group rates' on any line or lines of railroad in this state."

Of course such statutes apply to and affect only transportation between points within this State (Art. 6479, Rev. Stat., 1925).

■ While the statute permits "group rates" and they are applied both by the Interstate Commerce Commission and state commissions, in proper cases, they must not be unjustly discriminatory. A locality may possess an advantage over other localities because of its location or some other reason, but, said Chief Justice Brown in R. R. Commission v. Galveston Chamber of Commerce, 105 Texas, 101, "that advantage should not cause adverse discrimination nor favorable indulgence."

In R. R. Commission v. Galveston Chamber of Commerce, 115 S. W., 94 (writ of error refused), it appeared that there is practically no difference in distance from Galveston to any point

on the St. Louis, Brownsville and Mexico Railway, and from Houston to the same point on the same road and no difference in the cost of transporting freight to or from Galveston or Houston to any point on that road, yet Galveston paid a higher freight rate for the same distance and for the maximum distances than any of the other points competing with her for business at said points. The trial judge found as a fact that Galveston by reason of a deep water port and by reason of receiving her freight from seaboard territory at a less freight rate than Houston, and by reason of being situated as near by a practical route to points on the St. Louis, Brownsville and Mexican Railway as Houston, has a natural advantage over Houston in competing for trade along said road, which natural advantage has been destroyed by the differential rates complained of.

Chief Justice Key said in that case:

"It being shown that the acts of the Railroad Commission complained of require materially higher freight rates to be paid on shipments of freight to and from Galveston than are paid for similar shipments to and from Houston to points on the railroad referred to, it seems to us that the orders and rates complained of must be held to give an undue and unreasonable preference and advantage to Houston over Galveston. It is no answer to this to say that Galveston has natural advantages not possessed by Houston, and therefore, notwithstanding the difference in freight rates, it can hold its own in a commercial contest with Houston. We do not believe that it was the intention of the legislature, in creating the Railroad Commission and vesting it with power to make and regulate rates and charges, to confer upon that body authority to make discriminations for the purpose of offsetting natural and other advantages possessed by localities and individuals. In fact the first subdivision of the article was modeled after and is substantially the same as the third section of the 'interstate commerce act' and in construing that act it has been repeatedly held that each locality is entitled to its natural advantages. Judson on Interstate Commerce, Sec. 184 and authorities there cited; Interstate Commerce Commission v. B. & O. R. R., 145 U. S., 263."

As shown by the testimony, the effect of Circular or Order 7529 is to impose a lower basis of rates on sugar shipped from these five points than from Houston.

As stated by defendants in error in their brief, the Houston dollar will purchase a materially less amount of transportation

service than the dollar of the shippers at any of the other points. For instance, on such basis of rates, under the 183 mile scale, for 38 cents the shipper of sugar carloads at Houston can purchase 100 miles of service, the shipper at Sugarland can purchase 130 miles, and the shipper at Galveston can purchase 150 miles. For 42½ cents, the Houston shipper can purchase 130 miles, the shipper at Sugarland can purchase 160 miles, the shippers at Galveston and Texas City can purchase 180 miles, and the shipper at Beaumont can purchase 230 miles.

This preference is to the shippers of sugar at Galveston, Texas City, Sugarland, Beaumont and Port Arthur alone, and not to those of any other place in the State, regardless of the size, location, circumstances or conditions.

Houston is not nearer to all sugar consuming localities in the State than the five points named. There is a large area in East Texas shown by the testimony and diagrams in evidence, to which Beaumont and Port Arthur are nearer than Houston, and to destinations in which they enjoy lower freight rates than Houston, under Circulars 7193 and 7529; there is also a large area in West and Southwest Texas nearer to Sugarland than to Houston, in which Sugarland enjoys lower freight rates than Houston under Circulars 7193 and 7529, and a smaller area in Southeast Texas nearer to Galveston and Texas City than to Houston, in which they enjoy lower freight rates than Houston under Circulars 7193 and 7529. Nowhere is Houston given a corresponding benefit as to localities nearer to her than to the other points.

■ One of the elements of a proper group rate is that one rate shall apply from all points in the group to a given destination. The Interstate Commerce Commission, in Pittsburg Steel Co. v. Lake Shore & M. S. Ry. Co., 27 I. C. C., 173, 178, said "When rates are grouped we deal with one rate which is made precisely the same to the different points within the group without guesswork or approximation."

■ The order of the Commission does not make one rate to apply from all points in the group, but the rate from each individual origin to destination beyond a certain distance is made to depend on whether the rate from Houston or from the particular origin point is greater to that particular destination. The rate made to apply from the various points is based upon the minimum of the service performed by the carrier in reaching the nearest point in the so-called group. If in any case the scale would give either of these points a lower rate than would

apply from Houston, the scale is made to apply; if on the other hand, to other destinations lower rates can be secured by using the rates from Houston, then the latter rates will apply, but Houston is not given the same rights of lower rates than those fixed for her, though enjoyed by the other points in the group.

We have reached the conclusion that the Court of Civil Appeals correctly disposed of this case and its judgment is therefore affirmed.

Adopted by the Supreme Court January 23, 1935.