**THOMAS et al. v. STANOLIND OIL & GAS CO. et al.**

No. 9498.

Court of Civil Appeals of Texas. Austin.

May 30, 1945.

Rehearing Denied June 20, 1945.

Grover Sellers, Atty. Gen., J. C. Davis, Jr., Asst. Atty. Gen., and Looney & Clark and Everett L. Looney, all of Austin, for appellant.

Frank J. Scurlock and Turner, Rodgers, & Winn, all of Dallas, for appellees Stanolind Oil & Gas Co., and Tide Water Associated Oil Co.

Dan Moody and J. B. Robertson, both of Austin, for appellee Shell Oil Co.

McCLENDON, Chief Justice.

Rule 37 case. The appeal is from a final judgment cancelling a permit issued by the Commission (Railroad Commission of Texas) to Thomas to drill a second well on a 3.33-acre tract (a voluntary subdivision of a 10-acre tract) in the East Texas Oil Field, as an exception to Rule 37, to prevent confiscation and waste. The suit was brought by Stanolind (Stanolind Oil & Gas Company) and Tide Water (Tide Water Associated Oil Company) adjacent lease owners against Thomas and the Commission. Later Shell (Shell Oil Company), another adjacent lease owner, intervened as party plaintiff. The trial was to the court without a jury and the judgment cancelled the permit and en-

joined production thereunder. Thomas and the Commission have appealed urging the following substantially stated grounds of error:

1'. Refusal to stay the trial pending Thomas' active Navy service under the S.S.C.R.A. Soldiers' and Sailors' Civil Relief Act of 1940, 50 U.S.C.A.Appendix, § 501 et seq.

2. Refusal to sustain a plea to the jurisdiction predicated upon pendency in the Commission of a motion of Shell for rehearing.

3. Failure to show that there was no evidence before the Commission to support the order to prevent waste.

4. Like failure with reference to evidence to prevent confiscation.

With reference to ground 1, the pertinent facts follow: The motion for stay of proceedings under the S.S.C.R.A. was filed December 11, 1944. It was sworn to on that day by Thomas' attorney; and while in form the affidavit is not on information and belief, it is manifest that some of the essential factual allegations of the motion could not have been personally known to the attorney. This was conceded by the attorney at the argument, who stated that it was his understanding that affidavits of attorneys in the course of legal proceedings were understood to be upon information and belief. We are not aware of any such understanding. We had supposed that the affidavit of an attorney was given the same construction as that of any other affiant, and that where he stated that he was "familiar with the facts therein alleged, and that such allegations are true in substance and in fact," the facts so verified were upon his personal knowledge, and not merely upon information furnished by his client. Under the circumstances we treat the affidavit as one on information and belief, gained from conferences with his client. The permit was granted December 23, 1940, and the suit was filed December 28, 1940. The well had been drilled under a prior permit which had been cancelled, and was under continuous production from the date of the instant permit. Thomas was not accepted for service (in the Navy) until January 4, 1943, and not called to active duty until February 12, 1943. The record showed many settings, postponements and continuances of the case, beginning with January 9, 1941, and continuing through the years 1941, 1942, 1943 and 1944. The mo-

tion was predicated upon allegations (substantially stated): that Thomas was a qualified petroleum engineer; that he was present when wells 1 and 2 on the tract were drilled and knew the productive character of the sands underlying the tract and surrounding tracts; that he examined the cores for porosity, sand thickness and other sand conditions necessary to be known in order to properly determine the sand conditions necessary for the justification of the well No. 2; that by reason of the unusual conditions of the sand underlying the lease underground waste was occurring at the time the permit was granted different from that occurring as to the field as a whole and as to the area as a whole, "in that the three wells on the 10-acre tract were and are unable to recover that percentage of the oil underlying said lease equal to the percentage recovered from the sands underlying the field as a whole and the area generally." There was a further allegation that the drainage was away from said lease to adjacent leases (commonly referred to as uncompensated net drainage). Further it was alleged that his presence was necessary at the trial in order to direct his attorney in the examination of witnesses; and that "as to the particular lease in question, and the particular area in question he does not know and cannot ascertain after diligent inquiry where he could obtain someone with equal knowledge of the facts and conditions to substitute for him, either in assisting the attorneys representing the defendants, or in giving the testimony favorable to the sustaining of the permit." The motion stated that Thomas had been, since February 12, 1943, continuously in the service of the Navy, but there was no statement as to where he was or had been stationed, or that he was so situated that his deposition could not be taken, or his affidavit given as to the particular facts within his own knowledge which could not be supplied by other witnesses. There was a hearing on the motion and the record showed: There was a hearing on the first application before a Commission examiner on September 5, 1940. The examiner's notes showed the following: "Mr. Thompson (appearing as attorney for Thomas), a licensed land surveyor, stated that applicant was requesting a second well on his 3.33-acre tract as an equidistant and staggered east offset to Sklar Oil Corp. No. 1 Magrill and also as a staggered and equidistant north offset to Stanolind No. 3 Magrill which he shows on his map to be located 150 feet south of applicant's south line. He stated it is applicant's contention that this second well is necessary to protect this 3.33 acres from drainage."

This is all the examiner's notes showed was offered on behalf of Thomas. The hearing before the examiner on the instant application was held on December 18, 1940. At this hearing Thomas does not appear to have been present, but was represented by three attorneys, one of whom was the attorney representing him on the trial below who made affidavit to the motion for stay. Another was Gordon Griffin, who gave evidence before the examiner and who testified for Thomas at the trial below. Mr. Griffin was an experienced petroleum engineer, quite familiar with the East Texas Field and the area here involved. He had a wide experience as engineer for various oil companies, and for a number of years was in the employ of the Commission, first as engineer in Southwest Texas, then field engineer in the East Texas Oil Field, and later chief petroleum engineer. He has testified in behalf of permittees in a number of Rule 37 cases, and may be regarded as a seasoned expert in this field of petroleum engineering. We quote from the examiner's report:

"Applicant's witness, Gordon Griffin, testified at the hearing that a 10-acre lease of the same size and shape as the combined 10-acre lease considered, lying adjacent to the north, had five wells thereon, and that a similar tract of 10 acres to the south and adjacent to the 10-acre tract under consideration had four wells located thereon as against three wells located upon the 10-acre tract upon which the location is applied for; that said 10-acre tract is at a disadvantage, both with respect to spacing and density, with the 10-acre tract lying to the north and south, and that in his opinion it is necessary to drill an additional well upon such combined 10-acre lease, of which applicant's 3.33-acre portion is a part, in order to give the owners of such tracts an equal opportunity with the owners of the adjacent leases within the drainage area, of recovering the oil from beneath said 10-acre lease and to prevent drainage from such 10-acre lease.

"The witness, Gordon Griffin, further testified that the drilling and production of oil from well No. 2 as applied for by applicant will enhance the ultimate recovery

of oil from the area and from the East Texas oil field, and thus prevent physical waste."

It also appears from the record of the trial that the case was fully developed.

■ While differing in a number of respects, we think the instant case is ruled by holdings in Roosth & Genecov Production Co. v. Shell Oil Co., Tex.Civ.App., 175 S.W.2d 653, 655, for reasons we now state. Quoting the Roosth case: "The suit was brought under Sec. 8 of Art. 6049c, V.A.C.S., which directs that 'Such suit shall be advanced for trial and be determined as expeditiously as possible and no postponement thereof or continuance shall be granted except for reasons deemed imperative by the Court.' Moreover, time was and is of the very essence of the suit. The well was drilled and was being operated under the permit, which operation is continued under supersedeas bond. The longer the suit pends the greater the amount of oil produced, and the incident· deleterious consequences are irreparable. The evidence shows conclusively that the well was not needed to prevent either waste or confiscation. As to waste, the Commission alone had a litigable interest (Shell Oil Co. case, above), and the Commission has not appealed."

■ Under the above showing, and the failure of the application to be verified by applicant, or to show that his affidavit could not be procured, or that his deposition could not be obtained, we think the trial court did not abuse its discretion in overruling the motion.

■ Furthermore, no motion for new trial was filed, and therefore the trial court's action in this regard is "considered as acquiesced in" under Rule 325, T.R.C.P. Roosth case, above.

Upon the second ground—overruling jurisdiction plea based on pendency before the Commission of Shell's motion for rehearing—the record shows: The first permit was granted October 11, 1940, and October 17, 1940, Stanolind filed motion for rehearing with the Commission; accompanying which was a letter from Stanolind's attorney to the Chief Supervisor of the Oil and Gas Division, requesting that Thomas be instructed to suspend any action under the permit pending action on the motion. The letter was quite lengthy, discussed the Commission rule authorizing rehearing motion within 15 days after permit order, and the practice thereunder of allowing operation under the permit before the motion was acted on. The letter also suggested referring the matter to the Attorney General. The motion was overruled October 22, 1940, and the well completed seven days later. It may be of interest to note that some time between December 23, 1940, and May 13, 1941, the Commission adopted a practice of inserting in Rule 37 permit orders, a clause to the effect that the order "shall not become effective until 15 days after it is actually signed by the Commission" and that if motion for rehearing be filed within that time the order would not be effective until the motion were overruled, and if granted the order should be subject to further Commission action. See Trapp v. Atlantic Refining Co., Tex.Civ.App., 170 S.W. 2d 506, error refused, wherein were involved two orders dated respectively December 23, 1940, and May 13, 1941. The instant permit was granted December 23, 1940, and this suit was filed by Stanolind and Tide Water five days later. At that time no motion for rehearing had been filed. Shell filed motion for rehearing January 6, 1941, on the bottom page of which appear the following pencil notations:

"Case now in court—1—"
"Rehearing"

| | | |
|---|---|---|
| "Granted" | | "Denied" |
| "E.O.T." | | "J.S." |
| "O.C." | | |

"Action withheld for reasons on back."

The initials were those of the three Commissioners, E. O. Thompson, Olin Culberson and Jerry Sadler.

On the back of the motion the following notations appear in the handwriting of Commissioners Thompson and Culberson, respectively:

"Jan. 20, 1941. The Stanolind Oil and Gas Co. having filed suit in court on this matter it appears to me that the jurisdiction of the R. R. Commission on this motion is doubtful and therefore I withhold action until the court has passed on the pending suit. To say the least, the administrative body, where there is any doubt, should properly defer to the court's jurisdiction. Ernest O. Thompson, Commissioner."

"Jan. 24. Motion having been filed in due time with the Commission I see no reason to change the Commission action and my action in granting motion for re-

hearing stands as is. Olin Culberson, Commissioner."

March 15, 1943, Shell's attorney wrote the Commission's Oil and Gas Division, calling attention to the contention of Thomas that the court was without jurisdiction because of pendency of its motion for rehearing, and requesting action on the motion. No action, other than as stated above, has ever been taken on the motion. Later Shell intervened as party plaintiff in the suit. As stated the record shows continued production under the permit from its date to the date of trial—a period of approximately four years. The allowable for this well during that period was 20 barrels per days for some 20 or more days per month. There had therefore been produced under the permit at the date of trial approximately 20,000 barrels of oil.

We overrule this ground for the following reasons:

■ Absent statutory requirement, a motion for rehearing is not a prerequisite to the right of appeal from an order of an administrative board. Houston Chamber of Commerce v. Railroad Comm., Tex.Civ. App., 19 S.W.2d 583, affirmed 124 Tex. 375, 78 S.W.2d 591, where this point was expressly approved.

■ Granting, arguendo, the power of the Commission to set aside its orders upon motion for rehearing seasonably made, we are clear in the view that where such orders are prospective in character, are immediately effective, are put in operation by the parties in whose favor they are made, and their operation infringes upon the rights of interested parties; the right of appeal in favor of the latter at once arises. This holding was made in Smith v. Wald Transfer & Storage Co., Tex.Civ.App., 97 S.W.2d 991, error dismissed, where the question was discussed at some length and need not here be repeated. This would seem also to follow from the holding in Rabbit Creek Oil Co. v. Shell Petroleum Corp., Tex.Civ.App., 66 S.W.2d 737, and Sun Oil Co. v. Gillespie, Tex.Civ.App., 85 S.W.2d 652, error dismissed, expressly approved in Magnolia Petroleum Co. v. Railroad Commission, 128 Tex. 189, 96 S.W.2d 273.

■ We therefore hold that the order of December 23, 1940, being immediately effective from its date, and the well having been put in operation thereunder by Thomas, possessed the degree of finality essential to immediate appeal therefrom; and that the suit of Stanolind and Tide Water divested the Commission of further jurisdiction in the matter. See Stewart v. Smith, 126 Tex. 292, 83 S.W.2d 945; Railroad Commission v. North Texas Coach Co., Tex.Civ.App., 92 S.W.2d 268. Moreover, under every applicable equitable consideration, a party who actually operates under such order to his own advantage and to the disadvantage of another, should be held estopped to assert the non-finality of the order in defeat of right of the injured party to the only relief available to him.

■ It would further seem clear that the non-action of the Commission upon the motion, coupled with Shell's intervention in the suit, constituted abandonment of the motion. Certainly the failure of the Commission to act on the Shell motion, over which Stanolind and Tide Water had no control, could not operate to the prejudice of those companies. It may be seriously questioned whether a procedural rule of the Commission could be supported as reasonable, the effect of which would be to defeat the right of appeal of an adversely interested party from an order which was immediately effective, was put in effect and operated under by the party in whose favor made, and thereby immediately and continuously deleteriously affected the rights of such adverse party.

■ Upon the fourth ground—that the order was supported by substantial evidence upon the prevention of confiscation basis: There was no material conflict in the evidence regarding the physical facts—underground conditions, porosity, permeability, sand thickness, etc. As stated the case appears to have been fully developed; and no stone appears to have been left unturned by Thomas' attorney and his experienced, capable and informed expert witness, Mr. Griffin, to demonstrate that the well was essential to prevent confiscation. We shall not attempt a statement of the evidence in any great detail. We regard the case as ruled on this point by the recent holding of this court in Miller v. Railroad Commission, 185 S.W.2d 223, 226, error refused; and only a résumé of the pertinent essential facts need be given. The 10-acre tract was approximately 1200 ft. east-west and 360 ft. north-south, and had been subdivided into three tracts of 3-1/3 acres each (400 x 360 ft. each). The Thomas was the center tract. The Sklar

was to the west and the Shell (Magrill) to the east. Each of these three tracts had one well, thus giving to the 10-acre tract a density of 3.33 acres per well. The eight times circular area (80 acres) had 19 wells or 4.21 acres per well. With the additional well in suit the 10 acres would have a density of 2.5 acres per well. The average potential of the 10 acres was 632 and of the eight times area 625. The average bottom hole pressure of the 10-acre tract was 1063 and of the eight times area 1054. Average sand thickness of the 10 acres 25 of the eight times area 24.58. Acre feet of sand 250 and 1966.40, respectively. Acre feet per well 83.33 and 103.49, respectively. All the wells in this area had the same daily allowable of 20 barrels. The 10 acres had 60 barrels per day gross, or 6 barrels per acre, or .240 barrel per acre foot, as against 380 gross, 4.75 per acre and .193 per acre foot for the eight times area. The added well on the 10 acres increased the advantage over the eight times area as follows: 8 barrels per acre of sand against 4.75 barrels; .320 barrels per acre foot as against .193 barrels. It will thus be seen that from every comparative viewpoint the 10 acres had a decided advantage over the eight times area. While there was some variation in potentials and the permeability and porosity, which were below the average of the field, the evidence showed that these factors had no appreciable bearing upon the present or ultimate relative recovery as between the 10 acres and the adjacent area. The only plausible theory under which the order might be supported on the prevention of confiscation theory was that indicated in the above-quoted testimony of Mr. Griffin in the examiner's notes; namely, that by reason of the location of wells to the north and south of the 10 acres there was uncompensated net drainage away from the 10 acres to the north and south leases. The facts in this regard were that in the 10 acres of equal shape abutting the north line of the 10 acres in issue there were 5 wells, and in a like area abutting the south line there were 4 wells; and by applying the equidistant offset theory the 10 acres in issue was at some disadvantage as compared with the immediately surrounding area. It was shown, however, without contradiction that the lease in question was located in the eastern portion of the field; that the water drive was from west or northwest; that this eastward drive replenished the oil in the leases to-

ward the east as it was extracted by production; that there was as much oil under the lease at the time of trial as had been there in place originally; and there was in fact no uncompensated cross drainage relatively between the 10 acres on the one hand and adjacent leases on the other. The substance of Mr. Griffin's testimony on this phase of the case is embodied in the following excerpts:

"Q. Mr. Griffin, you say that the ten-acre tract has substantially the same amount of oil beneath it that it had when the field was first discovered? A. That is true."

\* \* \* \* \*

"Q. All right. Well, at any rate, whatever oil the John J. Thomas tract, if any, has lost by reason of drainage across its lines has been replaced in some way or other so far as practical matters are concerned; that is correct, isn't it? A. That is correct.

"Q. So there has been no net drainage away from that tract? A. There has been no net drainage except loss of recoverable migrated oil.

"Q. By the loss of recoverable migrated oil what do you mean by that? A. Well, in other words, he is permitted also, like the rest of those leases—in other words, the ten-acre lease is in no different shape than the rest of the leases or the fact that they are likewise being replaced by a migratory oil, so in my opinion they are all entitled to that migrated oil into that area, so the wells—and incidentally the production is from wells, not leases—the leases surrounding that tract are getting more of the migrated oil and a bigger portion of that migrated oil than is the ten-acre lease."

This last statement, however, was not predicated upon the eight times circular area, but upon an eight times area consisting of 8 tracts of the same dimensions as the 10 acres placed one each abutting its 4 sides and one at each corner. This eight times area contained 27 wells as against 19 in the eight times circular area. Manifestly this eight times area extended only some 360 feet to the north and south, but some 1200 feet to the east and west of the 10 acres. It excluded large sparsely drilled areas to the north and south which were much nearer the 10 acres than other included more densely drilled areas to the east and west. But even so, and under the most favorable construction that could be placed upon Mr. Griffin's testimony, the

factual situation is not essentially different from that in the Miller case, as shown by the following quotation from the opinion: "No such uncompensated drainage from one tract to an adjoining tract of the oil thereunder was shown in the instant case. On the contrary, all oil extracted from all wells in this area was replaced, not by local drainage, but by the general migration of oil from the west."

The fact that the Commission granted the instant permit and refused that in the Miller case could have no material bearing upon the controversy here. The evidence in the two cases being in every essential element the same, and being without substantial conflict, the Commission could not properly apply one rule in one case and another in the other.

From the foregoing statement it also appears that the permit cannot be supported upon the prevention of waste theory (ground three).

 One other issue is presented by appellees—that the judgment cancelling the first permit was res judicata of the issue of confiscation. The judgment in that case recited that Thomas and the Commission had "agreed that plaintiff and intervenors have judgment cancelling the permit." The judgment also recited that it was without prejudice to the right of Thomas to reapply for a permit and for the Commission to hear and determine same. Independently of these recitals, we hold that the judgment was not res judicata of the validity of the instant permit because the first application was predicated upon the needs of the segregated 3.33-acre tract, whereas the instant permit was based upon the needs of the 10-acre tract. It is true that the second application was in form for an additional well on the 3.33 acres and made no reference to the 10 acres. However, all other leaseholders in the 10 acres and all leaseholders of adjacent leases were notified of the hearing. The examiner stated at the hearing that the application was based upon the needs of the 10 acres, the previous permit having been cancelled by agreement because it was based solely upon the needs of the 3.33 acres. The evidence heard was submitted upon the theory only of the need of the 10 acres, and the order granting the permit was expressly based solely upon such needs. No protest was made by any party to this construction of the application. Under the circumstances we hold that any defect or omission in the application in this regard was waived.

The trial court's judgment is affirmed.

Affirmed.