D. H. BOLIN, Appellant,

v.

P. K. SMITH et al., Appellees.

No. 15733.

Court of Civil Appeals of Texas.

Fort Worth.

Sept. 28, 1956.

Rehearing Denied Oct. 26, 1956.

Kilgore & Kilgore and John E. Kilgore, Dallas, for appellant.

C. J. Brannan; Rogers & Eggers; Nelson, Montgomery, Robertson & Sellers, and Ernest Robertson, Wichita Falls, for appellees.

BOYD, Justice.

Upon a jury verdict, judgment was rendered against appellant D. H. Bolin and in favor of appellees P. K. Smith, J. B. Nail, O. C. Egdorf, S. G. Denny, Kindel Paulk, E. A. Denney, and The First National Bank of Wichita Falls, executor and trustee under the will of Theodore Beck, deceased, impressing a constructive trust upon an undivided one-half interest in a mineral leasehold estate in the Min Gault 320 acre tract, which is the West ½ of what is known as the Howard land in Montague County, and for money recoveries aggregating approximately $500,000, consisting of the net proceeds received by appellant from the sale of oil from the interest impressed with the constructive trust, sums awarded in an accounting in connection with operations engaged in by the parties, and interest. Appellees John H. Arrington and J. R. Reagan were awarded small recoveries on some of the accounting features of the case.

As originally filed, the suit was by the appellees other than Arrington, Reagan and the executor Bank, primarily against appellant Bolin to impress constructive trusts upon the Howard leases and the Gist and Crownover "farmout" leases, and for an accounting. Appellees Arrington, Reagan and the executor Bank were made parties defendant, but they answered and adopted the position of the plaintiffs. Before a trial on the merits, a summary judgment in favor of appellant was granted, from which appellees appealed. Detailed statements of the background of this controversy will be found in the opinion of this Court on that appeal in Smith v. Bolin, 261 S.W.2d 352, and in the opinion of the Supreme Court in Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93. The summary judgment was affirmed as to the Gist and Crownover farmout leases and as to the accounting matters pertaining to the cost of the original Howard leases and of drill-

ing the first Howard well. The judgment was reversed and remanded as to the interest of any of appellees in the new Howard leases and as to other accounting matters.

The original contract declared upon by appellees was a written partnership agreement dated December 1, 1946, between appellant and appellees Paulk, Smith, Arrington, Reagan, Denny, Nail, Denney, and Egdorf. The agreement was entered into at appellant's solicitation, and he was to be the managing partner. He alone transacted the partnership business. Appellees were business and professional men and not primarily engaged in the oil business. Appellant was an oil operator with many years' experience. Appellees reposed implicit confidence in him. The partnership was formed for the purpose of "buying, selling, trading, exchanging, developing, equipping, and producing oil, gas, mining leases, real estate, royalties, and all other minerals and other property and interests therein within the State of Texas." It was provided that appellant should pay into the common fund 1/3 and the other parties 2/3 of the total fund "with which such firm begins and thereafter continues to do business," except that appellant was to pay 1/2 and the other parties 1/2 of the expense of equipping any lease that the partnership might acquire. Appellant was to receive 1/2 of any profits and the other parties 1/2. Title to all properties acquired by the partnership was to be taken in the name of appellant as trustee. All funds were to be deposited in the bank to the credit of the partnership and checked out only by appellant or under his direction. The business was to continue so long as the parties might mutually desire.

When deemed necessary, the original plaintiffs will be referred to as "plaintiffs," the executor Bank as the "Beck Estate," Arrington and Reagan by name, and all of the parties adverse to appellant as "appellees."

From the beginning of operations until the partnership lease on the Howard land expired March 12, 1950, several oil drilling ventures were engaged in, resulting in the expenditure of many thousands of dollars, and all were complete failures. The first ventures were the acquisition by the partnership from appellant of, and the drilling upon, the Scruggs and Oldham blocks in Oklahoma. Appellees Arrington and Reagan did not participate in any ventures after the Scruggs and Oldham failures. During the existence of the original Howard leases, which were acquired from appellant individually by a group composed of appellant and the plaintiffs joined by Theodore Beck, appellant, as drilling contractor for the partnership, drilled two dry holes on the Howard land, one on the Gault, or west Howard land, and the other on the Paine, or east Howard land. Appellant billed the other parties for their part of the expenses incurred in all the failures, which they paid. At no time during the period from the execution of the written agreement on December 1, 1946, until after appellant acquired for his own account the new Howard leases in June, 1950, did he intimate that he was not still acting under the terms of the agreement.

In November, 1949, appellant was urged to secure for the partnership farmout leases on the Gist and Crownover tracts, which lie immediately north of the Howard land. Appellee Smith testified that he gave Kay's geology on the area to appellant, which indicated that oil would be found on the north part of the west Howard land and on the Gist and Crownover tracts; that he told appellant of the indications for production found by himself and other associates in prior drilling ventures on the northwest part of the Howard land. On March 9th or 10th, 1950, while appellant was negotiating with Standard Oil Company of Texas for the Gist and Crownover farmouts, Standard showed him its geology on the area. Standard's division ex-

ploration superintendent testified that in those conversations he wanted to know if the Howard land was under lease and that appellant said, " 'I have got it,' " and that the witness said, " 'Well, if it is your tract, it is okey, * * * I don't want somebody else to get it if we are going to be drilling a well in here.' " The Howard leases were owned by the partnership at that time.

Oliver, Standard's geologist, testified that during these negotiations he discussed with appellant the geology in the vicinity of the Howard, Gist and Crownover tracts, and that information which the appellant and his geologist gave Standard as to the first Howard well contained geologic data. Kendall, appellant's geologist, wrote Standard on February 6, 1950, that a description of samples from the first Howard well, made by Martin, a consulting geologist, was significant in that Martin described "the 1900 ft. lime as 'crinoidal.' " The letter further stated that a local reef condition seemed indicated and "chances are that we want to try to define this 1900 ft. reef possibility, since it did have a substantial oil show."

Appellant acquired the Gist and Crownover farmouts for his own account on May 6, 1950, the negotiations therefor having been begun and a tentative agreement reached before the expiration of the original Howard leases. When requested by some of the plaintiffs to renew the Howard leases before their expiration on March 12, 1950, appellant refused to undertake to do so. He acquired for his own account new leases on the Howard land on June 20, 1950, after there was a good showing of oil in his Gist farmout well from the same formation encountered in the first Howard well, which showing appeared about June 18.

Appellant's son testified that in behalf of his father he requested Edwards to approach the owners of the Howard land "to lease this land from them. * . * * I asked him to check and see if the lease was open and available, and what price." Paine, a son of one of the Howard land owners and a nephew of Mrs. Gault, the other owner, and who handled the leasing for his mother and aunt, testified that Edwards contacted him about leasing the tract a month or six weeks before the leases were executed on June 20, 1950; that Edwards first offered $3 per acre and witness asked $10; that Edwards later offered $5, which witness refused; that Edwards contacted witness several times, in person and by telephone; that after Edwards finally offered $10, witness made some investigation of the progress of the Gist farmout well and, learning there was a good show of oil, he asked $15 per acre for the leases, which Edwards agreed to pay. The leases were made to appellant as lessee.

When plaintiffs and the Beck Estate learned of these acquisitions, they offered to pay their pro rata part of the cost, which offer appellant refused. There were several producing oil wells on the Gault lease at the time of trial. Whether plaintiffs and the Beck Estate are entitled to any interest in the new Howard leases is, aside from certain accounting matters, the question in this suit.

At plaintiff's request, the court appointed an auditor who filed a detailed report of the financial transactions of the partnership and appellant's financial transactions relating to the acquisition and development of the new Gault (west Howard) lease.

Among other things, the jury found: that appellant gained some geological information as to the Howard land from drilling the two wells thereon prior to March 12, 1950, and that such information was a motivating circumstance influencing him to acquire the new leases; that as the acting manager of the partnership affairs, appellant gained geological information from other sources as to the Howard land which was a motivating circumstance influencing him to take the new leases; that the re-

lationship entered into by the parties was a continuing one which had not ended prior to June 20, 1950, and that appellant occupied a fiduciary relationship to plaintiffs and the Beck Estate when he acquired the new Howard leases; that because of the failure of appellees to file suit prior to June 22, 1952, appellant's situation had not become so changed that he could not be restored to his former condition; and that appellant's action in drilling the new Howard lease was not taken in good faith in reliance upon a belief that the plaintiffs would not institute suit against him asserting claims in such leases.

Appellant assails the judgment under nine groups of points, covering 138 assignments. The complaints in the groups of points are summarized as follows: (1) the court's failure to treat the former judgment as res judicata of all matters concerning the farmout leases; (2) the court's failure to treat the former judgment as res judicata of the accounting matters as to acreage and well costs; (3) the court's error in refusing appellant's motion for a separate trial on the issues as to the Howard lease from the accounting issues; (4) the court's failure to sustain appellant's motions for instructed verdict, for judgment on the verdict and for judgment non obstante veredicto; (5) errors in trying the defensive issues of dissolution, abandonment and termination of prior adventures; (6) other errors in regard to the trial of accounting matters prior to March 12, 1950; (7) errors in the court's judgment as to the accounting pertaining to the cost of drilling the second Howard well, and the cost of the development of the new Howard lease, and other findings and holdings in the judgment; (8) errors of the court in overruling appellant's exceptions to allegations as to the state of health of Theodore Beck and his exceptions to a portion of the auditor's report; and (9) the cumulative effect of errors pointed out resulting in denying appellant a fair trial.

On this trial, plaintiffs and the Beck Estate did not seek recovery as to the Gist and Crownover farmouts; no issues were submitted as a basis for any such recovery; and no recovery was had thereon. We therefore think the court did not fail to "treat" the former judgment as res judicata as to the farmouts. Appellant complains of the court's action in overruling his exceptions to the pleadings setting out appellant's transactions in negotiating for and acquiring the farmout leases, and the overruling of his motions to strike from the record evidence introduced bearing upon those transactions. We fail to find where appellant objected to such evidence when it was offered. In fact, appellant offered some evidence relating to acquiring the farmouts. We do not think the first group of points reflects error. 3-A Tex.Jur., sec. 166, p. 213; 31 Texas Law Review, p. 128; Chesshir v. Nall, Tex.Civ.App., 218 S.W.2d 248; Poole v. State Highway Department, Tex.Civ.App., 256 S.W.2d 168; Fleming Oil Co. v. Watts, Tex.Civ.App., 193 S.W.2d 979. Moreover, we think the Supreme Court held that the transactions relative to appellant's acquisition of the farmout leases constituted "Some of the evidence, which raises a fact or fact issues as to the Howard leases, * * *." Smith v. Bolin, 271 S.W.2d 93, 94.

Under his second group of points, appellant insists that the judgments of this Court and the Supreme Court on the appeal from summary judgment affirmed the summary judgment as to the accounting involved in the acquisition of the Scruggs and Oldham blocks and as to the cost of drilling the second Howard well. We do not so construe those judgments. The only accounting matters foreclosed were those pertaining to the cost of the acquisition of the original Howard leases and the drilling of the first Howard well. The accounting matters between the parties to the original partnership agreement were remanded by this Court in this language, "Judgment of the trial court is affirmed except as to the accounting upon the delay

rental payments due and paid on the Howard land leases in 1948 and 1949, and as to the accounting as to the dissolution of partnership of December, 1946. Judgment of the trial court is reversed and the cause remanded for a trial of the issues upon these accountings." We understand that this part of the judgment of this Court was affirmed by the Supreme Court. The remanded portion of the accounting features of the case includes the cost of the Scruggs and Oldham blocks. That venture was undertaken by the identical persons who signed the written partnership agreement. As heretofore indicated, we agree with appellant that the accounting matters pertaining to the acquisition of the original Howard leases and as to the drilling of the first Howard well have been adjudicated by the prior judgments.

■ No error is perceived in the court's action in overruling appellant's motion to try separately the issues as to the Howard leases from the accounting issues. Appellant invokes Rule 174, subd. (b), Texas Rules of Civil Procedure, which provides that the court, in order to avoid prejudice, may order a separate trial of any claim or separate issue. He concedes, however, that the application of the Rule rests in the sound discretion of the trial court. We are constrained to hold that no abuse of discretion is shown by this record in the action of the court on that motion. Montgomery v. Willbanks, Tex.Civ.App., 202 S.W.2d 851.

■ Appellant in his fourth group of points complains of the action of the court in overruling his motions for instructed verdict, for judgment upon the verdict, and for judgment non. obstante veredicto. It seems to us that appellant is here seeking to have decided favorably to himself issues which were foreclosed against him by the holding of the Supreme Court on the appeal from summary judgment. In his argument in support of this group of points appellant contends that under the evidence, as a matter of law, plaintiffs and the Beck

Estate are not entitled to recover any interest in the Howard leases or in the net proceeds of the oil produced therefrom, or to impress a constructive trust upon the property; and that if they ever had any such right they had lost it by laches. His position is that the evidence fails to raise any issue as to the continuing nature of the partnership relation or whether appellant occupied any fiduciary relation to the other parties when he acquired for his own account the new Howard leases, and that therefore there was no issue for the jury's determination on that phase of the case or any support for the judgment rendered thereon by the court.

On appeal from summary judgment, and on evidence essentially the same as that in the record now before us, the Supreme Court, after summarizing the evidence, held that it was a question of fact as to whether the relationship between the parties was a continuing one or whether it was a series of separate and distinct relationships; that it was a question of fact whether a fiduciary relationship existed between appellant and plaintiffs and the Beck Estate at the time appellant acquired the new Howard leases; and that the evidence "raises a fact question or fact questions as to the Howard leases to be determined by a trial court or jury, and not this Court or the Court of Civil Appeals." These questions have been determined, and unfavorably to appellant, by the jury and the trial court.

In this connection, we deem it unnecessary further to detail the evidence. But we have given careful consideration to all the evidence, and are unable to bring ourselves to the conclusion that it is insufficient to support the verdict of the jury and the judgment of the trial court as to the nature and duration of the relationship between the parties and the right of plaintiffs and the Beck Estate to impress a constructive trust on the west Howard lease and to share in the proceeds of minerals already recovered therefrom. We refer to the

opinion of the Supreme Court on the appeal from summary judgment. Smith v. Bolin, 271 S.W.2d 93, and authorities there cited.

In appellant's fifth group of points it is contended that as a matter of law, under the evidence, all ventures were terminated no later than March 12, 1950, the date on which the original Howard leases expired, and that the court erred in overruling his motion to disregard the answers of the jury to the effect that the relationship between appellant and plaintiffs and the Beck Estate was a continuing one and that appellant occupied a fiduciary relation to the other parties when he acquired the new Howard leases.

We think it would serve no useful purpose to detail the evidence on these issues. In all essential respects, the evidence is the same as it was on the motion for summary judgment. We quote from the Supreme Court's opinion on that appeal: "Whether the relationship between D. H. Bolin and the petitioners was a continuing relationship until about June 1950, as contended by the petitioners, or whether it was a series of separate and distinct relationships as contended by respondent, D. H. Bolin, is a question of fact." Smith v. Bolin, 271 S.W.2d 93, 94.

In the sixth group of points contention is made that the court erred in overruling appellant's motion for judgment non obstante veredicto as to accounting matters involving the cost of acquiring and drilling the Scruggs and Oldham blocks and of acquiring the original Howard leases and of drilling the first Howard well. We have already said that we think the matter of the cost of acquiring the original Howard leases and of drilling the first Howard well was adjudicated by the summary judgment, which in that respect was affirmed. Left for trial, however, by the remand, were accounting matters pertaining to the cost of acquiring and drilling the Scruggs and Oldham blocks.

The points in the seventh group relate to alleged errors in the judgment pertaining to the accounting as to the cost of drilling the second Howard well and the cost of developing the new Howard leases by appellant; also in this group are points challenging certain findings and holdings of the trial court as contrary to the law or not supported by the evidence. We have studied all of these points in the light of appellant's thorough brief and oral argument, but do not think that error is reflected. Most of his argument is an elaboration of appellant's principal contention that under the law and the evidence appellees are not entitled to recover, and that appellant's association with the other parties was a series of separate and distinct relationships, all of which had terminated before his reacquisition of the Howard leases. These questions are not matters of first impression. We think the Supreme Court has outlined the duty of the trial court in having such issues determined by the triers of the facts, and, since we believe the evidence is sufficient to support the jury's verdict and judgment of the court, such findings and holdings are binding on this court.

In appellant's eighth group of points complaint is made of the court's action in overruling appellant's exceptions to that part of the Beck Estate's pleading which alleged the state of mind and health of Theodore Beck, and appellant's exception to a portion of the auditor's report.

Beck died on May 31, 1950, after the expiration of the original Howard leases and before appellant acquired the new lease on such tract. The allegations as to Beck's health were substantially that illness had rendered him unable to attend to his business affairs, and that he had no knowledge or notice that appellant had breached any fiduciary duty, or that appellant had ever contended that the partnership relation had terminated. There was medical testimony, elicited without objection, that during the last three or four months of his

life Beck was virtually an invalid. Regardless of whether such pleading was relevant to any material issue, we are of the opinion that overruling such exceptions did not constitute reversible error. Rules 434 and 503, T.R.C.P.

The part of the auditor's report to which this exception was leveled pertained to the cost to appellant and his charge to plaintiffs and the Beck Estate covering the acquisition of the original Howard leases. Appellant charged and the other parties paid on the basis of $6 per acre, or $3,480. The auditor's report listed appellant's cost at $1,517.65, and plaintiffs and the Beck Estate were awarded recovery for the alleged overcharge with interest. The matter of the accounting as to the cost of the original Howard leases was determined in appellant's favor by the affirmance of that part of the summary judgment. Smith v. Bolin, Tex.Civ.App., 261 S.W.2d 352 and 153 Tex. 486, 271 S.W.2d 93. This point is sustained.

We are unable to agree with the contention presented in appellant's last point, which is designated as group nine, that even if reversible error is not shown by any single matter standing alone, the cumulative effect of all of such alleged errors resulted in denying appellant a fair trial. If we thought this record was replete with errors, no one of which would require a reversal, but the total effect of which was such that we felt in the due administration of justice the judgment ought to be set aside, a different situation would be presented.

The record is voluminous and very complicated, and a study of it shows that the proceedings were guided by an alert and able trial court.

We do not extend an already lengthy opinion to discuss severally the 138 points of error presented by appellant. But every point has been carefully considered in the light of the lucid and comprehensive briefs and oral arguments submitted by all parties, and, in our opinion, error requiring a remand is not reflected.

By eliminating the recoveries, including interest, awarded to plaintiffs and the Beck Estate on the accounting matters covering the cost of the original Howard leases and of drilling the first Howard well, the judgment is reformed so as to reduce the money recovery awarded to appellee Smith by $480.48, and the money recoveries awarded to appellees Nail, Egdorf, Denny, Paulk, Denney, and the Beck Estate each by $240.24.

As reformed, the judgment is affirmed. Costs of appeal are taxed against appellant.

MASSEY, Chief Justice.

I dissent.

While the appellees' pleadings are sufficient to aver that appellant's reacquisition of the Howard land leases was fraudulent as to them under the circumstances, there was no finding by the jury that such reacquisition was a "bad faith" reacquisition. In view thereof I am of the opinion that the judgment, in respect to the imposition of a trust upon the reacquired lands, does not find any basis in the verdict of the jury.

Though there were several issues submitted to and found by the jury to the effect that each of two individual parcels of information jointly belonging to appellant and appellees were "one of the motivating circumstances" which influenced the appellant's reacquisition of the leases, it is my opinion that T.R.C.P. 279 is not to be invoked in respect to implying a finding that the acquisition was fraudulent or made "in bad faith", so as to support the judgment.

There is no question but what the information obtained during the course of the drilling of the well on the nearby Gist lease was a "motivating circumstance" in the total of the knowledge possessed by the appellant at the time the leases were

reacquired. In view of the notice we may take thereof, then we are bound to recognize, in view of the jury's findings, that there were at least three items or parcels of information embraced in appellant's total store of knowledge, which were "motivating circumstances" in the lease reacquisition. Two of the parcels: geological knowledge obtained in the drilling operations on the lease, and geological information relative to the lease obtained from outside persons, were found by the jury to have been "motivating circumstances". There is no jury finding that without the concurrence of either or both said parcels appellant would not have reacquired the leases. There is no jury finding that appellant acted in "bad faith" toward appellees when he re-leased the premises.

As I view the state of the record in which it reached this court, the appellees' case is one wherein their judgment impressing a trust upon the Howard land leases must be sustained or reversed upon the theory of appellant's having misused information jointly belonging to the appellees along with appellant in re-leasing said properties for his own account without opportunity given appellees to join with him in the venture in proportion to their former interest therein. As it reaches this court the case clearly is not one wherein the judgment may be affirmed on the theory of a continuing relationship, unless the appellant's obligation with respect to such use of information is considered a fiduciary duty. Certainly it would be the only duty in respect to the Howard land leases, though if it existed as to such leases it likewise existed with respect to the leases in Oklahoma.

That being the situation, I believe that the evidence and the issues are to be tested in the same way that the old-time mining cases were tested in instances wherein a "grubstaked miner" made a discovery for himself and his "grubstaker", conducted himself so that the property reverted, then later reacquired the same property for him-

self to the exclusion of such fiduciary. In those cases the persons who sought to impress a trust upon the reacquired properties were permitted to do so upon establishing that there was a "bad faith reacquisition". The mere fact that a miner reacquired such a property vested no right in his former fiduciary. The fiduciary could establish a trust right in the property only when fraud played a part in the miner's reacquisition.

Consider the hypothetical case where under a fiduciary relationship a miner abandoned a site as nonproductive, but where he had encountered a very troublesome quartz or other formation. Assume that he allowed the premises to revert and his fiduciary relationship came to an end. Assume that shortly thereafter he learned that a certain precious metal was ordinarily located immediately below the formation which had proven so troublesome. Would he be helpless to reacquire the property for himself? Need he first seek out his "grubstaker" and give him full information and a new opportunity to participate?

Under such a hypothetical situation it does not seem logical to me that such a miner's former fiduciary could impress a trust on the property, though it be undisputed that the knowledge about the formation formerly encountered was a "motivating circumstance" in the reacquisition. Under my understanding of the old mining relocation cases proof and findings going no further than the situation hypothecated would not support a judgment impressing a trust on the property.

Under the mining cases the element of "bad faith" was indispensable to the right of a fiduciary to impress a trust on reacquired property. This seems logical to me as a principle of law. But the instant case was not submitted to the jury under any theory applying the principle. Rather it was submitted to the jury under the theory that the property should be impressed with a trust if any part of the knowledge possessed and acted upon by the appellant in the reacquisition embraced information

which belonged to the appellees as well as the appellant.

Though I am of the opinion that the "bad faith" factor is an indispensable element to a recovery in this kind of case—for the sake of further discussion I will yield and adopt as a premise that a fiduciary may impress a trust on reacquired property if the act of reacquisition would not have occurred but for the fact that there was certain information in the possession of the reacquirer which belonged equally to his fiduciary and himself. It is to be noted that the judgment in this case was not supported by such a finding.

Reverting to the hypothetical situation of the miner who had encountered the troublesome quartz or other formation which was later learned to overlay precious metal, this premise would entitle the miner's former fiduciary to impress a trust on the property without any requirement to prove "bad faith", for all he would have to prove would be that "but for" the knowledge that the troublesome quartz or other formation was present in the mine (information belonging to both the miner and the fiduciary) the miner would not have reacquired the property.

In the instant case the appellees obtained a judgment impressing a trust upon the reacquired leases without having ever obtained a finding that "but for" the appellant's knowledge which was trust property there would have been no reacquisition. The only findings obtained by them operated to establish that appellant was "motivated" in reacquiring the Howard land leases by a total store of information, part of which was knowledge jointly belonging to them and the appellant. Of course, every part of the information relative to the property "motivated" appellant's reacquisition. But it might reasonably appear in every acquisition of property of any kind after the purchaser had actually determined that he would purchase, motivated in his decision by reasons he deemed good and sufficient, there might be other information coming to his attention between the time of decision to purchase and the time of his consummation of the purchase, further convincing him of the wisdom of the act determined upon. But it also might well be that he would have consummated the purchase even though the new information had never been received. It could properly be said that the new information was a "motivating circumstance" in the purchase, but it could not be said that "but for" the knowledge thereof he would not have made the purchase. It is easy to visualize the analogy of the situation if it be further assumed that the new information was given the purchaser by someone in a fiduciary relationship with him who might seek to impress a trust on the property purchased. Though more difficult, the analogy would likewise appear to information received from a fiduciary even before the purchaser made a decision to purchase. That situation would more closely approximate the situation in the case at bar.

What I mean to say is that appellees should not, in my opinion, and even under the premise adopted for purposes of discussion, be permitted to subject the reacquired lands to a trust unless they showed the "motivating circumstances" involving their property rights in the information to have been of such consequence that the appellant would not have reacquired the Howard land leases "but for" his joint interest with them in the information received during their association.

In a personal injury negligence action, a wrongful act or omission on the part of the defendant (though occurring or concurring with another or others) must nevertheless be one without the occurrence of which injury would not have been inflicted on the plaintiff, notwithstanding any others with which it concurred, or it would not be a proximate cause of plaintiff's injury. In a negligence case a plaintiff may not recover merely upon findings that the defendant was guilty of various acts or omissions, he must further show that one or more of such acts or omissions were such as produced his injury, and without

which the injury sustained by him would not have occurred. Such a plaintiff is obliged to demonstrate both a violation of duty in relation to him and that his injury resulted directly and proximately as the result thereof.

To hold that the appellees' judgment in the instant case is supported merely upon a finding that certain knowledge within the possession of the appellant "contributed" to the entire store of knowledge which caused him to reacquire the Howard land leases would set a dangerous precedent. A majority of the "wildcat" operations in the oil industry involves fiduciary relationships. Under the precedent where one of the fiduciaries might be moved to reenter a lease previously unsuccessfully drilled, in making a further search, the legal obligation would be imposed upon him to seek out all persons who had been associated with him in the prior enterprise and tender them the opportunity of joining with him in the new venture, making full disclosure of his reasons for desiring to reacquire the lease. If he should not do so, and should he discover oil in paying quantities, any of his former fiduciaries would be able to impress a trust upon the property if he could prove merely that some geological or other information acquired during the course of the prior venture was a "motivating circumstance" in his act of reacquisition or in the institution of the new drilling operations. Of course, possible defenses might be visualized in such a case, but not to a former fiduciary who does not discover what has occurred until production is already realized and who promptly volunteers his participation.

I am compelled to advert to the conclusion reached at page 366 of the opinion of this court reported in 261 S.W.2d 352 (of which the writer was author) where it is stated: "In order for a constructive trust to be impressed upon such leases so re-acquired it would in our opinion be necessary that the knowledge obtained during and because of the partnership relation of

trust be sufficient in itself to have occasioned Bolin's act in re-leasing the Howard lands. It must have been, of itself, the causative factor occasioning his act." At that stage of the opinion the matter of "good faith re-acquisition" of mining properties was considered.

It is not my construction of the majority opinion of the Supreme Court, in its reversal of our former judgment upon the phase of the case under consideration, that such Court overruled my statements relative to the necessity for appellees to establish the appellant's bad faith as a predicate to their right to impose a constructive trust on the reacquired properties. Rather, it is my understanding that the case was reversed because it was held that fact questions were posed entitling the parties to a trial on the merits. The fact question of fraudulent reacquisition was tried by the jury following the action of the Supreme Court, but the jury was not given an opportunity to resolve such question in the special issues submitted to it. Adverting to the verdict of the jury it is to be noted that appellant was never found guilty of fraud in reacquiring the leases. Neither was there any finding of bad faith on his part. There was no finding that the knowledge belonging jointly to appellant and appellees was sufficient to cause or did actually cause appellant to reacquire the property. The jury merely found that there was a fiduciary relationship and that certain knowledge which was the parties' joint property constituted a "motivating circumstance" in the reacquisition.

Conceding that the pleadings and the evidence were sufficient to entitle appellees to have submitted to the jury the issues resolving the question, they should not be permitted to recover when the issues were not submitted and when the courts are not empowered to imply favorable findings in support of the judgment.

I do not believe a judgment secured under these circumstances should be permitted to stand.