**CITY OF WESLACO, Texas, et al.,**
**Appellants,**

**v.**

**GENERAL TELEPHONE COMPANY OF THE SOUTHWEST, Appellee.**

No. 13820.

Court of Civil Appeals of Texas.

San Antonio.

Nov. 29, 1961.

Rehearing Denied July 5, 1962.

Holdridge & Preston, San Angelo, Smith, McIlheran & Jenkines, Weslaco, for appellant.

Holdridge & Preston, San Angelo, for appellee.

POPE, Justice.

This is a telephone rate case. The trial court permanently enjoined the City of Weslaco, a home rule city, from enforcing the terms of a rate regulatory ordinance enacted June 21, 1960. The injunction was granted upon General Telephone's contention that the City had no power to regulate intra-state rates, and the local rates were confiscatory, as that term is used in rate cases. General Telephone Company of the Southwest v. City of Wellington, 156 Tex. 238, 294 S.W.2d 385, 389. We must determine (1) whether General Telephone exhausted its administrative remedy before resorting to the courts, (2) whether a Texas municipality has the power to regulate the rates for intra-state calls which originate among its inhabitants within the City, and (3) whether the depreciation, as an expense item was correctly and consistently computed by the court.

■ General Telephone exhausted its administrative remedy, and the trial court properly overruled City's plea to abate the suit. Hearings began in January, 1960, and proceeded intermittently on several occasions until June 21, 1960, when the City passed its ordinance fixing both intra-state and local rates. The ordinance was immediately effective. In the course of the hearings, City demanded certain information, particularly with respect to intra-state business. General Telephone steadfastly refused this information on the grounds that the City had no regulatory powers over intra-state rates, and information about long-distance business was irrelevant. Although the City passed the rate regulation ordinance, it undertook to reserve jurisdiction over rate matters for one year and until the requested information was furnished.[1] General Telephone then filed this suit and the trial court correctly overruled City's plea in abatement. As stated in Glen Oaks Utilities, Inc. v. City of Houston, 161 Tex. 417, 340 S.W.2d 783, 785:

"An administrative body cannot, by reserving for itself the power to change a ruling, deprive the courts of jurisdiction to the detriment of the parties injured by the ruling. Railroad Commission of Texas v. Houston Chamber of Commerce, 124 Tex. 375, 78 S.W.2d 591; Southern Surety Co. v. Hendley [Handley], Tex.Civ.App., 226 S.W. 454."

■ City, under existing authorizations, does not have rate regulatory powers over intra-state calls. A delegation of such powers must be expressed by clear language or by clear implication. Railroad Commission of Texas v. Houston Natural Gas Corp., 155 Tex. 502, 289 S.W.2d 559; Texas-Louisiana Power Co. v. City of Farmersville, Com.App., 67 S.W.2d 235, 238; Coleman Gas & Oil Co. v. Santa Anna Gas Co., Com.App., 67 S.W.2d 241, 242; City of Baytown v. General Telephone Company of the Southwest, Tex.Civ.App., 256 S.W. 2d 187, 190. Such delegation of powers can not extend beyond the territory of the city or its inhabitants. City of Arlington v. Lillard, 116 Tex. 446, 294 S.W. 829. The legislative delegation of powers with respect to local service is apparent, but it is also apparent that the Legislature has treated local and long-distance service as distinct and different problems.

■■ The power to regulate telephone rates comes from Articles 1119, 1124 and 1175(12), Vernon's Tex.Civ.Stats. Under those statutes the business of providing local service may be authorized by a franchise previously granted by a municipality. A franchise is a special privilege conferred by the government upon some one, which privilege does not belong to citizens generally. State v. Austin & N. W. R. Co., 94 Tex. 530, 62 S.W. 1050; 86 C.J.S. Telegraph, Telephone, etc. § 12. In some instances, without such a franchise the privilege can not be exercised. West Texas Utilities Co. v. City of Baird, Tex.Civ.App., 286 S.W.2d 185. It is, of course, without dispute that Weslaco has granted a franchise to General Telephone to provide local service to the inhabitants of that City.

■ Intra-state service, on the other hand, may be furnished without the grant of a franchise. This important distinction between local service and intra-state service is made in Athens Telephone Co. v. City of Athens, Tex.Civ.App., 163 S.W. 371. Accord, Athens Telephone Co. v. City

[1] "Section 2: The City Commission of the City of Weslaco hereby retains jurisdiction of this rate hearing, until advised by General Telephone Company of the Southwest that the rates so fixed are agreeable to them for a period of one year, and further reserves jurisdiction to require the additional information necessary to make determination of all issues involved and to reduce the above rate schedule, if, after such additional evidence is produced, such reduction is fair alike to the Telephone Company and the subscribers of the Weslaco exchange."

of Athens, Tex.Civ.App., 182 S.W. 42. A city may not interfere with such service and the service may be furnished without a franchise, as a matter of right. In contrast with Articles 1124 and 1175(12), which are the source of municipal power to regulate local service, is Article 1416,[2] which authorizes intra-state service without the grant of a franchise. That statute applies to long-distance telephone companies. San Antonio & A. P. Ry. Co. v. Southwestern Telegraph & Telephone Co., 93 Tex. 313, 55 S.W. 117, 49 A.L.R. 459. Except for such regulations as will avoid inconveniences to a city in the use of its streets, it has been held that "the city had no authority to require the telephone company to accept its ordinances as a condition precedent to entering the city." City of Brownwood v. Brown Telegraph & Telephone Co., Tex.Civ.App., 152 S.W. 709, 106 Tex. 114, 157 S.W. 1163. The Brownwood case concerned a company that was furnishing intra-state telephone service from Goldthwaite to Temple and desired to erect facilities along the streets and alleys of Brownwood. The Court stated that "the right of the telephone company to pass through the city or town, over and upon its streets, is absolute, and a city has no authority to deny that right." We regard it settled, therefore, that the powers of cities over local telephone service are different from and broader than their powers over intra-state service. A franchise, though non-exclusive, may be required for local service but not for intra-state service.

We shall now examine in some detail the two articles upon which Weslaco, as a home rule city, relies for its power to regulate intra-state rates. Article 1175 (12) authorizes the City:

"(1) To prohibit the use of any street, alley, highway or grounds of the city by any telegraph, telephone, elec-

tric light, street railway, interurban railway, steam railway, gas company, or any other character of public utility without first obtaining the consent of the governing authorities expressed by ordinance and upon paying such compensation as may be prescribed and upon such condition as may be provided by any such ordinance. (2) To determine, fix and regulate the charges, fares or rates of any person, firm or corporation enjoying or that may enjoy the franchise or exercising any other public privilege in said city and to prescribe the kind of service to be furnished by such person, firm or corporation, and the manner in which it shall be rendered, and from time to time alter or change such rules, regulations and compensation; * * *. In order to ascertain all facts necessary for a proper understanding of what is or should be a reasonable rate or regulation, the governing authority shall have full power to inspect the books and compel the attendance of witnesses for such purpose." (Numerals are added.)

In the first sentence of the quoted statute, there is a requirement that a public utility, before it can use the streets and other grounds of the city, must have municipal consent and must pay for the privilege. This is a lawful requirement for local service, but not for intra-state service. The second sentence specifically states the powers which flow to the city as a result of its grant of a franchise. This statute grants the power over that which is franchised, meaning local service which can be performed only upon the grant of a franchise. The statute says more. It states, not merely that the power to regulate rates applies to franchised corporations, but further limits regulatory powers geographically by adding,

2. "Article 1416. Corporations created for the purpose of constructing and maintaining magnetic telegraph lines, are authorized to set their poles, piers, abutments, wires and other fixtures along, upon and across any of the public roads, streets and waters of this State, in such manner as not to incommode the public in the use of such roads, streets and waters."

"in said city." See City of Arlington v. Lillard, supra.

The other claimed source of power is Article 1124, which provides:

"(1) Any city having a special charter or a charter adopted or amended under the provisions of chapter 13 of this title, (2) and having authority under its charter to determine, fix and regulate the charges, fares or rates of compensation to be charged by any person, firm or corporation (3) enjoying a franchise in said city, shall in determining, fixing and regulating such charges, fares or rates of compensation, base the same upon the fair value of the property of such person, firm or corporation devoted to furnishing service to such city, or the inhabitants thereof, * * *." (Numerals are added.)

■ City meets the first requirement stated in the statute. When we come to the second, however, we find that the charter grant of power is no broader than these statutes which we are parsing. In fact, its powers are there stated to reach a corporation which exercises any right of franchise of public privilege.[3] Intra-state service is not dependent upon any right of franchise of public privilege. At this point, the City fails under Article 1124. The third requirement is a statutory statement that rate regulation may be exercised over a corporation enjoying a franchise in said city. Because General Telephone does have a franchise in said City, its rates may be regulated. The franchise, however, is essential to local service, not intra-state service. We conclude that the powers over rate regulation are co-extensive with the powers over

local service which the City possessed in granting its franchise. The powers do not include intra-state service. See, General Telephone Co. of the Southwest v. City of Wellington, 156 Tex. 238, 294 S.W.2d 285, 291; Southwestern Bell Telephone Co. v. City of San Antonio, 5 Cir., 75 F.2d 880, 883.

■ The historical reasons for treating local and intra-state service differently are explained by City of Cherokee v. Northwestern Bell Telephone Co., 199 Iowa 727, 202 N.W. 886. Iowa is the only State, other than Texas, which has established no method for state-wide regulation of telephone rates. There, as in Texas, local service may be dependent upon a franchise while intra-state service is not. We conclude that the City has no regulatory powers over intra-state long-distance telephone service, and the trial court properly enjoined the City from enforcing these portions of the rate regulatory ordinance.

■ The trial court also enjoined the City's regulation of local rates, because such rates are confiscatory. We reverse this part of the judgment. To fix the rate of return one must determine (1) the fair value of the plant, (2) the operating revenues, and (3) the operating expenses. The difference between the last two items is the net operating income. Those earnings must produce a fair return of the fair value of the plant. The parties do not dispute the fair value as fixed by the trial court at $675,245.33. The operating revenue from local service during 1959 was $197,878.90. The operating expense for 1959 was $166,280.00. The dispute between the parties concerns the amount of operating expenses, and that argument essentially nar-

3. "Said City shall have the power to determine, fix or regulate the charges, fares, and rates of any person, firm or corporation exercising, or that may hereafter exercise any right of franchise of public privilege in said City, and to prescribe the kind of service to be furnished, the equipment to be used, the manner of which service shall be rendered and to change such regulations from time to time; that in order to ascertain all the facts necessary for a proper understanding of what is or should be reasonable rate or regulation, the governing authority shall have full power to inspect the books and other records of such person, firm or corporation and compel the attendance of witnesses for such purpose; * * *."

rows down to the annual depreciation item which was fixed at $37,592.67 for 1959, the test year. City urges that the depreciation item is loaded with excess expense, which if correctly computed would show less expense, more income, and a higher rate of return.

■ Depreciation is an important element which enters into the determination of the fair value for the rate base. It is also important in determining the annual depreciation expense. Depreciation can be determined by several methods. One method may be called the accountant's method of amortizing costs. By this method there is a systematic distribution of the cost or other basic value of tangible capital assets, less salvage over the estimated useful life of the unit. The original cost of an asset is treated as a prepaid operating expense to be apportioned among the years of its life. Annual depreciation is the portion of the total charged under such system that is allocated to the year. The difference between the cost of an asset and the total of the accumulated depreciation charges made to date against the asset is called the book value or the unamortized cost. These annual depreciation charges may be determined in several methods. One method is the straight-line method. By this method, the annual depreciation is computed by dividing the book cost or other basic value, less salvage, by the estimated useful life of the item involved. Accrued accumulation under this system for all previous years was $128,626.08, or 18.02 per cent of the original plant cost. City urged this method in working out the rate base; General Telephone attacked it as unrealistic.

A second method for determining depreciation may be called the appraisal concept of depreciation. This is observed depreciation. Appraisal engineers optically inspect and give their judgment of the present cost for replacement of the plant new. Appraisers also give their judgment of the per cent relation of the existing plant in its present condition to like items reconstructed new.

The difference between the percentages thus estimated and one hundred per cent is called depreciation. The mathematics of the depreciation computation may be stated otherwise. The appraisers estimate the present cost of replacing the property new. They also estimate the present fair market value of the existing plant. The difference between the two estimates represents the accrued appraisal depreciation. In this case accrued appraisal depreciation was estimated at $72,915.84, or 9.02 per cent of the plant value reconstructed new. General Telephone urged this method in working out the rate base. City claimed that it was too hypothetical.

■ No single system may universally be called the only correct one, but whatever system is used, it should be consistently used. If one system which produces a low depreciation is used in determining the rate base; a different system which produces a high depreciation should not be used in determining the annual expense. The rule of consistency is enjoined upon rate makers in Railroad Commission v. Houston Natural Gas Corporation, 155 Tex. 502, 289 S.W.2d 559:

"Where the property rate base is based in part upon an adjusted reproduction cost new, the proper treatment of depreciation is both complex and difficult. In the company's accounts at bar some depreciation is charged as an annual expense item. We have not examined it in detail and the state has not attacked this so we do not pass upon it. The item of depreciation of a given piece of property appearing in current expenses for rate purposes should be closely correlated with the 'fair value' appraisal of the same piece of property from year to year, and the whole should be consistent."

The Court in Iowa-Illinois Gas and Electric Company v. City of Fort Dodge, 248 Iowa 1201, 85 N.W.2d 28, 47–49, observed this rule of consistency. In that case, there

was proof of both an appraisal depreciation and of straight-line depreciation. The Court expressed little confidence in the evidence which proved appraisal depreciation, and therefore used straight-line depreciation. In doing so, however, it consistently used that method both for the rate base and for the annual depreciation expense item. Inconsistent methods for computing depreciation were discovered in Los Angeles Gas & Electric Corporation v. Railroad Commission, D.C., 58 F.2d 256, 261. See also, Denver Union Stock Yard Co. v. United States, D.C., 57 F.2d 735, 745.

■■■■■ The trial court found that the local rates fixed by the City were confiscatory, but it did so by using two inconsistent methods of depreciation. It used the appraisal method for proof of the rate base and the straight-line method for proof of annual expenses. We shall first examine the proof with respect to the rate base. City claimed the benefit of accrued straight-line depreciation of $128,626.08 and asked that it be subtracted from the original plant investment. General Telephone, on the other hand, insisted upon the appraisal method which showed accrued depreciation of only $72,915.84, and asked that it be subtracted from the estimated value of the plant reconstructed new. Thus was drawn the line. The City insisted upon high straight-line depreciation on a low original cost. General Telephone insisted upon a low appraisal depreciation on a high replacement value. The court solved the dispute by fixing the fair value for the rate base at the exact arithmetic mean between the two contentions. To this were added two items which were not disputed, and that brought the rate base to $675,245.-33.[4]

The rate base was reached by consideration of four elements. Those four elements were approved in Railroad Commission v. Houston Natural Gas Corporation, supra, by its statement that the value for plant equipment is "a reasonable balance between the original cost less depreciation and replacement cost new less an adjustment for present age and condition." The trial court accordingly reached a reasonable balance between (1) original cost (2) less straight-line depreciation, as urged by the City, and (3) appraisal of the reproduction cost new, (4) less appraisal depreciation, as urged by General Telephone. The first two elements produced a low value; the last two produced a high value. By taking all factors into consideration a rate base was produced which is supported by the evidence, is accepted by both parties, is not disputed, and both parties are now anchored to it.

Depreciation, as an annual expense item, was computed by a method which was inconsistent with the method used in arriving at the rate base. The trial court did not take into consideration the depreciation computed by both the appraisal method and the straight-line method. It did not strike

---

4.

**Accounting Method**

| Plant Investment Per Co. Books | Depreciation Reserve | Net Value |
|---|---|---|
| $701,690.33 | $128,626.08 (18.02% depreciation) | $573,064.25 |

**Appraisal Method**

| Reproduction Cost New | Per Cent Condition | |
|---|---|---|
| $807,948.92 | 90.98 or $72,915.84 (9.02% depreciation) | $735,033.08 |

| | | |
|---|---|---|
| Mean of the Two Methods | | $654,047.67 |
| Working Capital | | 8,147.57 |
| Materials and Supplies | | 13,049.09 |
| | Rate Base | $675,245.33 |

a mean between theories which produced low and high depreciation figures. In fact, the trial court had no evidence before it by which it could arrive at depreciation as an annual expense by the same method it used in fixing accrued depreciation for determining the rate base. General Telephone abandoned its ideas of appraisal depreciation when it came to the matter of annual depreciation for the test year, 1959. There is no proof of annual depreciation grounded on that method. Annualized appraisal depreciation requires proof of two appraisals, one at the beginning of the test year and another at the end of the year.[5] General Telephone turned to the method it had previously rejected, and its proof of annual depreciation is by the straight-line method. The result was that it used low appraisal depreciation to keep the rate base high, and the straight-line depreciation to keep its income low.

The depreciation for the 1959 annual expense item is excessive. The figures in this case are instructive. While relying upon appraisal depreciation to prove the rate base, General Telephone proved that accrued depreciation was only 9.02 per cent of the plant reconstructed new. This amounted to $72,915.85. By changing to straight-line depreciation, its proof, accepted by the court, was that for the one year, 1959, the plant depreciated 5.14 per cent of its value reconstructed new. This amounted to $37,-592.67. Comparing the two results, the figures are disproportionate. More than one-half (5.14%) of all accrued depreciation (9.02%) occurred during the one test year. $37,592.67 of the accrued depreciation ($72,915.85) occurred during that year. This is enough to show that if appraisal depreciation had been annualized, it would have shown a smaller depreciation. If, on the other hand, depreciation for fixing the rate base had been by the straight-line method, and the plant value reconstructed new had been depreciated 5.14 per cent per year for several years, there would have been much higher accrued depreciation. Consistency would argue that if General Telephone used appraisal depreciation for computing the fair value it should have used appraisal depreciation to compute annual expense. If, on the other hand, it used a straight-line method to compute expense, it should have used a straight-line method to compute the fair value. Appraisal depreciation was very low. Straight-line depreciation was high. General Telephone has used low appraisal depreciation to keep the rate base high, and the straight-line depreciation to keep its income low. If a mean between the high and low depreciation methods was used in arriving at the rate base, we see no sound reason that the low element should be dropped and the high element used exclusively in arriving at the annual expense.

The rates which were enjoined provide a return of 4.68 per cent on the fair value. That return, however, is determined by subtracting $37,592.67 as annual depreciation from the total operating revenues. The figure is too high in some unknown amount. We can not know it, for there is no proof of annualized appraisal depreciation, an important element, considered in reaching the rate base and disregarded in computing

---

5.

"Depreciation During The Year—Valuation Basis

Let RCN–1 = Cost of replacing plant at beginning of the year.
    RCN–2 = Cost of replacing plant at end of year.
    Val–1 = Value at beginning of year.
    Val–2 = Value at end of year.
    Dep–1 = Depreciation existing at beginning of year.
    Dep–2 = Depreciation existing at end of year.

Then (1) RCN–1 – Val–1 = Dep–1
     (2) RCN–2 – Val–2 = Dep–2
     (3) Dep–2 – Dep–1 = Depreciation during the year."

Depreciation—History and Concepts in the Bell System, page 21 (1957).

the expenses. We know that the depreciation as an expense item is excessive, and to the extent that it is excessive, there was more income and a return in excess of 4.68 per cent.

We observe that in computing the straight-line depreciation for the annual expense, General Telephone has depreciated a plant value of $730,997.01. We are unable to determine how this figure was reached. It is not the original investment, depreciated or undepreciated; nor the reproduction cost new, depreciated or undepreciated; nor the mean between the two. In our opinion, General Telephone has failed to discharge its burden to prove by consistent methods that the local rates are confiscatory. The permanent injunction should be dissolved.

That part of the injunction which enjoined enforcement of the intra-state rates is affirmed. That part of the injunction which enjoined the City from enforcing the local rates is reversed and the permanent injunction is dissolved.

MURRAY, Chief Justice (dissenting in part).

I concur in the opinion of the majority wherein it holds that (1) the Telephone Company exhausted its administrative remedy before resorting to the courts, and (2) the City of Weslaco did not have the power to regulate the rates for intra-state calls which originate among its inhabitants within the City, but I do not concur in the holding of the majority that the depreciation deduction for the year 1959, the test year, was not supported by the evidence, and that the trial court's error in using this item in determining the net revenue of the Telephone Company requires a reversal of the judgment.

The majority opinion on rehearing holds: "The issue is now narrowed to the determination of the depreciation rate, which in turn will control the amount of the depreciation expense. If the court fixed that rate too high, the expense for 1959 is too high, and the net income for 1959 is correspondingly too low." The majority decided that the annual depreciation of the plant for the year 1959, in the sum of $37,592.67, was too high, and therefore reversed the judgment and remanded the cause.

The majority find that the value of the local telephone plant in 1959, for rate base purposes, was correctly found to be the sum of $675,245.33; that the operating revenue from local service during 1959 was $197,-878.90, and that the operating expense for 1959 was $166,280.00, with the exception that the depreciation of $37,592.67 was too high, thus causing the net revenue to be too low.

The majority say: "The trial court erred because it fixed the annual depreciation rate by a method which is inconsistent with that used in fixing the rate base and the plant value." In my opinion, this is no reason for a reversal of the trial court's judgment. The Telephone Company would have preferred to take the same figure for a rate base value as it took for fixing the depreciation value, but in deference to the rule laid down in Railroad Commission v. Houston Natural Gas Corp., 155 Tex. 502, 289 S.W. 2d 559, the Telephone Company reluctantly agreed that the appraised value of the plant in 1959 might be correlated with the original costs, less straight-line depreciation on a 50% basis, thus lowering the rate base value of the plant from $735,033.08 to $675,245.33, which would make their annual percentage of income at a higher rate, so the taking of the rate base value at $675,-245.33, instead of $735,033.08, inured to the benefit of the City.

The evidence shows without dispute that the Telephone Company was entitled to a depreciation in the sum of $37,592.67. This was based upon the testimony of a number of experts whose testimony stands undis-

puted and, so far as I understand the record, unobjected to. Appellants' Exhibit No. 14 demonstrates how this figure was computed. To clarify this matter, I copy Exhibit 14:

## "GENERAL TELEPHONE COMPANY OF THE SOUTHWEST

Depreciation Expense at Present Rates
December 31, 1959 Levels

Weslaco Local Exchange

|  | Plant Value | Present Rates | Present Amount |
|---|---|---|---|
| Buildings | $ 40,574.65 | 2.25 | $ 912.93 |
| Central Office Equipment | 184,447.84 | 4.00 | 7,377.91 |
| Station Apparatus | 115,791.48 | 6.00 | 6,947.49 |
| Small PBX Equipment | 6,436.60 | 6.90 | 444.13 |
| Telephone Booths | 3,188.15 | 6.50 | 207.23 |
| Station Connections | 59,249.26 | 13.70 | 8,117.15 |
| Pole Lines | 86,926.57 | 5.00 | 4,346.33 |
| Aerial Cable | 176,229.70 | 4.00 | 7,049.19 |
| Underground Cable | 20,717.11 | 3.00 | 621.52 |
| Aerial Wire | 22,423.19 | 5.00 | 1,121.16 |
| Underground Conduit | 10,066.67 | 2.00 | 201.33 |
| Furniture and Office Equipment | 4.945.79 | 4.98 | 246.30 |
|  | $730,997.01 | 5.14 | $37,592.67" |

It will be seen that various rates of depreciation for various kinds of property were used, one as low as 2%, and one as high as 13.70%. The experts stated that these rates of depreciation were furnished by the Federal Communications Commission and were correct. There was no evidence to the contrary.

The total plant value of $730,997.01, as used in plaintiff's Exhibit 14, was the average of reproduction cost new before adjustment for present age and condition and gross book cost for all depreciable property accounts. In this connection, neither land nor vehicles and other work equipment are depreciable accounts under the Uniform System of Accounts, as prescribed by Federal Communications. The experts testified that unless the Telephone Company is allowed to recover this value during the useful life of the plant it is not recovering the proper depreciation. This testimony was not disputed. If present values should recede in future years, the City would be entitled to a new appraisal of the local plant

The majority have cited with approval the case of Iowa-Illinois Gas and Electric Co. v. City of Fort Dodge, 248 Iowa 1201, 85 N.W.2d 28. In that case a temporary injunction bond had been given by the Gas Company and certain refunds were to be made out of this bond. Much of the discussion in the opinion relates to calculating these refunds, a matter not here involved. There is some very interesting language found in that opinion. It is there stated:

"One question, then, is how much weight is to be given to original cost and how much to present-day construction costs, to arrive at a properly-judged figure as to present value. We think that where construction costs have been substantially level for a long period of time, perhaps for a large part of the average life expectancy of a utility property, original cost would merit major consideration. Where fluctuations of price levels are sharp, but seem likely to balance out over a short term, a '50–50' weighting such as that given by the trial court would be completely tenable. However, where con-

struction costs have fallen more or less continuously over a substantial period of time, *or have risen more or less continuously over such a period,* original cost can be given weight only to the extent that *a return to the same level appears reasonably imminent.*

"It would appear that the level of construction costs which can be expected to prevail in the foreseeable future would be a floor below which the pricing of the present value of a utility property could not go without *entering the area of possible confiscation.* In this, as in any other constitutional inquiry, the duty of the trial court is to determine the facts from the material and competent evidence before it, and not on its own impulse. We believe that in its approximate '50–50' fair value determination, unsupported in the record, the trial court was in error." (Emphasis mine.)

Under the conditions that exist in this country today, there is no one who is so optimistic as to believe that in the foreseeable future construction costs will soon return to levels of 1956. The general belief is that costs are going to climb higher. There is nothing in the record that contradicts this present trend, known to everybody. The trend in the foreseeable future is that prices will go higher and higher.

I am of the opinion that from the undisputed evidence the court properly held that the depreciation item for the year 1959 was $37,592.67.

The rate ordinance adopted in June, 1960, was not retroactive in its effect. It fixed future rates for the Telephone Company and it is shown that under such rates the Company will not be permitted to make a fair return on the fair value of its local plant at Weslaco, and is therefore confiscatory and void. In my opinion, the trial court properly so held. I would affirm the judgment and put it into immediate effect.

My original dissenting opinion handed down on Nov. 29, 1961, is withdrawn and this opinion substituted therefor.

On Motions for Rehearing.

POPE, Justice.

Contrary to what we said in the original opinion, the plant value for depreciation purposes was correctly fixed by the trial court at $730,997.01. The record shows that the plant value was arrived at by computing the average between (1) the reproduction cost new before adjustment for present age and condition as urged by General Telephone, and (2) the gross book cost as urged by the City. Subtracted from each of those items in advance were land and certain equipment, which the parties agree should not be treated as depreciable items. General Telephone is entitled to recover that figure through depreciation, amortized over the life of the plant. Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge, 248 Iowa 1201, 85 N.W.2d 28.

Hence, certain essential facts are settled. 1959 is the fair test year for the determination of net operating revenue and the operating expenses. General Telephone is entitled to a fair return on a rate base of $675,245.33. The plant value upon which General Telephone is entitled to compute its annual depreciation expense is fixed at $730,997.01. The trial court fixed not only the rate base, but also the plant value by giving equal weight to the appraisal methods urged by General Telephone and the non-appraisal methods urged by City. The issue is now narrowed to the determination of the depreciation rate, which in turn will control the amount of the depreciation expense. If the court fixed that rate too high, the expense for 1959 is too high, and the net income for 1959 is correspondingly too low.

The trial court erred because it fixed the annual depreciation rate by a method which is inconsistent with that used in fixing the rate base and the plant value. We do not hold that the straight-line accounting method of depreciation is a wrong method,

nor do we hold that the appraisal method is the only right one. Both in proper context are correct methods. The court merged both methods in fixing the rate base and the plant value, and we approve that method. We do not hold that the trial court necessarily had to give equal weight to the methods urged by General Telephone and City. The court, perhaps could, and in a proper case should, give greater weight to the one or the other. In this case, however, we find that the court used both methods to arrive at a fair figure for two of the essential elements in the rate formula, but in fixing the annual depreciation rate it wholly abandoned the appraisal method. The inequity of this method is mentioned in our former opinion, but it can be further illustrated.

Exhibit 4 contains the evidence urged by General Telephone as the appraised value of the plant as of December 31, 1959. It shows the percent condition of the plant as of that date. This information was used by the trial court and is an essential part of the figure reached in both the rate base and the plant value. General Telephone's proof of the annual depreciation rate is contained in its Exhibit 14. These were the rates used by the trial court. Depreciation was computed, not by giving weight both to appraisal and straight-line methods. Straight-line was used exclusively. This discloses that General Telephone used different methods for depreciating its property in connection with two significant elements in the result. When we place, side by side, the plant's appraised depreciation, as found in Exhibit 4, and the straight-line depreciation, as found in Exhibit 14, we see the differences in the rates of depreciation produced by the methods.[6] Buildings, under the appraisal method, on December 31, 1959, are ninety-seven per cent as good as new. For all time up to that date, they depreciated only three per cent. By shifting to the straight-line method, however, the buildings depreciate 2.25 per cent every year. Station connections, by appraisal, for all time up to December 31, 1959, depreciated only ten per cent, but by using the straight-line method, they depreciated fourteen per cent during 1959. Under the straight-line method, they depreciated more during 1959 than they had depreciated under the appraisal method for all time in the past. The other items are equally instructive.

The inconsistency is revealed by other proof offered by General Telephone. Its Exhibit 8 shows the appraised value of the plant as of March 31, 1959. This proof shows that the plant was 91.1 per cent as good as new. It had depreciated for all time in the past only 8.9 per cent. General Telephone further proved the appraised value of the plant as of December 31, 1959, nine months later. By that time, the plant had a total accrued depreciation of 9.02 per cent. During the nine-month period in 1959, therefore, the plant had depreciated only .12 per cent, a little more than one-tenth of one per cent. By shifting to the straight-line depreciation method, General Telephone proved that the plant depreciated 5.4 per cent during the twelve months of 1959. This was the figure taken by the trial court.

6.

| | Exhibit 4 Appraisal Method Per cent condition as of Dec. 31, 1959 | Exhibit 14 Straight-line Method for 1959 |
|---|---|---|
| Buildings | 97% | 2.25% |
| Central Office Equipment | 97 | 4.00 |
| Station Apparatus | 90 | 6.00 |
| Station Connections | 90 | 13.70 |
| Pole Lines | 82 | 5.00 |
| Aerial Cable | 90 | 4.00 |
| Underground Cable | 96 | 3.00 |
| Aerial Wire | 87 | 5.00 |
| Underground Conduit | 98 | 2.00 |

The court in fixing the annual depreciation wholly excluded any consideration of the method it had significantly considered in reaching the rate base and the plant value. The rate base and plant values were boosted by use of the appraisal method. The depreciation expense was also boosted by wholly excluding the low depreciation evidenced by the appraisal method. The net income for 1959 was correspondingly depressed. General Telephone failed to prove the appraisal depreciation for the twelve-month period of 1959, and, in our opinion, the use of the appraisal method in two parts of the rate formula and its total exclusion in fixing the annual depreciation rate violated the admonition in Houston Natural Gas ·Corporation, supra, that "The item of depreciation of a given piece of property appearing in current expenses for rate purposes should be closely correlated with the 'fair value' appraisal of the same piece of property from year to year, and the whole should be consistent."

 General Telephone argues that there was no point which attacks the depreciation rate. Both by point and argument, the matter is raised.[7] Gleason v.

Davis, 155 Tex. 467, 289 S.W.2d 228; Fambrough v. Wagley, 140 Tex. 577, 169 S.W. 2d 478.

Both motions for rehearing are overruled and costs are taxed equally against the parties.

---

**7.  City's Point of Error**

"4. The Trial Court erred in holding that 4.68% return on the Telephone Company's investment was confiscatory (presuming the Trial Court found 'expense-loading' income derived from depreciation collected from Weslaco subscribers, over and above original cost, was not profit)."

*Argument*

"The controversy is over whether or not the company must count as 'profit' the windfall it acquires through 'expense loading,' which makes the difference between their admitted 4.68% return, and the 7.-88% return they are making if the *windfall from depreciation alone* is put back in profit, where the ·City contends that it belongs. *  *  *

"*Depreciation and maintenance should be honestly handled*: Depreciation allowed as an expense must be correlated and consistent with depreciation deducted from the plants' 'fair value,' else it is unfair to either the utility or subscribers. *  *  *

"If the Telephone Company's sworn statement that it has collected a deprecia-

tion reserve from Weslaco subscribers of $122,819.42 (or 18.4%) as of March 31, 1959, or $128,626.08 (or 18.2%) as of December 31, 1959, is correct, then their statements on Plaintiff's Exhibit 8, that they have in the same period suffered actual depreciation of only 8.9% as of March 31, 1959, and only 9.02% as of December 31, 1959, is either patently false, or a large percentage of the actual depreciation has been recovered through maintenance. *  *  *

"But let us not ignore the mandate of honesty and fairness implicit in the dicta: 'and the whole should be consistent.' Such requirement of 'consistency' condemns as dishonest, and unfair, two schedules such as here involved, one claiming a high rate of depreciation and the other claiming that the full depreciation so claimed by the first did not in fact occur. So if 'fair value' is used in determining expense, so must 'observed depreciation' be used in determining the extent thereof, and the Plaintiff must not be allowed to collect it again under the guise of 'maintenance'."